IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Edward W. Nottingham**

Civil Action No. 06–cv–01006–EWN–MJW

LANCE CARR,

     Plaintiff,

v.

MORGAN COUNTY SCHOOL DISTRICT
RE-3, a political subdivision,

     Defendant.

---

## ORDER AND MEMORANDUM OF DECISION

---

     This is an employment discrimination case.  Plaintiff Lance Carr alleges that Defendant Morgan County School District retaliated against him by refusing to permit him to tutor in one of its schools based on his past opposition to disability discrimination in violation of the Americans with Disabilities Act, 42 U.S.C.A. § 12101 *et seq.* (West 2007) (the "ADA") and the Federal Rehabilitation Act, 29 U.S.C.A. § 794 (West 2007) (the "Rehabilitation Act").  Plaintiff also asserts a claim for obstruction of justice under 42 U.S.C.A. § 1985(2) (West 2007).  This matter is before the court on Defendant's "Motion for Summary Judgment," filed on February 1, 2007. Jurisdiction is premised upon 28 U.S.C.A. §§ 1331, 1367 (West 2007).

## FACTS

### 1.   *Procedural History*

On May 25, 2006, Plaintiff filed a complaint, alleging that Defendant retaliated against him based on his past opposition to discrimination.  (Compl. & Jury Demand [filed May 25, 2006].) On June 23, 2006, Plaintiff filed an amended complaint, adding claims for abridgment of his First Amendment rights and obstruction of justice.  (Am. Compl. & Jury Demand [filed June 23, 2006] [hereinafter "Am. Compl."].)  On July 17, 2006, Defendant filed its answer.  (Answer [filed July 17, 2006].)

On February 1, 2007, Defendant filed a motion for summary judgment, arguing: (1) Plaintiff's retaliation and First Amendment claims fail because Defendant did not subject him to an adverse employment action; (2) Plaintiff was precluded from tutoring at any of Defendant's schools based upon a prior settlement agreement between Plaintiff and Defendant; (3) Plaintiff's First Amendment claim is improperly premised upon a *respondeat superior* theory; (4) Plaintiff's obstruction of justice claim is preempted by the ADA and is unsupported by the evidence; and (5) Plaintiff suffered no constructive discharge.  (Mot. for Summ. J. [filed Feb. 1, 2007] [hereinafter "Def.'s Br."].)  On February 21, 2007, Plaintiff filed his response.  (Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J. [filed Feb. 21, 2007] [hereinafter "Pl.'s Resp."].)  On the same day, the parties filed a stipulated motion to dismiss Plaintiff's First Amendment claim with prejudice, which this court granted on February 26, 2007.  (Stipulated Mot. to Dismiss Pl. Carr's 2d Claim for Relief for Abridgment of 1st Amendment Rights Pursuant to 42 U.S.C. § 1983 [filed Feb. 21, 2007]; Order Granting Stipulated Mot. to Dismiss Pl. Carr's 2d Claim for Relief for Abridgment of 1st

Amendment Rights Pursuant to 42 U.S.C. § 1983 [filed Feb. 26, 2007].)  On March 8, 2007,

Defendant filed its reply brief.  (Reply in Supp. of Def.'s Mot. for Summ. J. [filed Mar. 8, 2007].)

On March 12, 2007, Plaintiff filed a partially unopposed notice of errata, requesting that

this court issue an order permitting him to replace certain pages in the section of his summary

judgment response brief entitled "Statement of Additional Disputed Facts" that contained

erroneous record citations.  (Pl.'s Partially Unopposed Notice of Errata [filed Mar. 12, 2007].)

Hereinafter, the court will treat the substitute pages proffered by Plaintiff as if they were

incorporated into his response brief and will disregard the pages they replace.

On March 14, 2007, Defendant filed a notice indicating it would not oppose Plaintiff's

substitution provided that the court would permit it to substitute its reply brief with an updated

version wherein the section entitled "Response to Statement of Additional Disputed Facts" had

been changed to correspond appropriately to Plaintiff's proposed changes to his brief.  (Notice Re

[sic] Pl.'s Partially Unopposed Notice of Errata [filed Mar. 14, 2007].)  Attached as an exhibit to

this filing was an amended brief upon which the court hereinafter exclusively relies as Defendant's

reply brief.  (*Id.*, Ex. A [Am. Reply in Supp. of Def.'s Mot. for Summ. J.] [hereinafter "Def.'s

Reply"].)  This matter is fully briefed.

## 2.     *Factual Background*

### a.     *The Parties' Prior Disputes*

In 1996, Plaintiff prevailed in a lawsuit alleging Defendant refused to hire him as teacher

based on his disability, muscular dystrophy.  (Def.'s Br., Statement of Undisputed Material Facts

[hereinafter "SOF"] ¶¶ 3–4; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Material

Facts [hereinafter "Resp. to SOF"] ¶¶ 3–4.)  The jury awarded Plaintiff $85,000 in damages and,

notwithstanding Defendant's opposition, the court ordered Defendant to hire Plaintiff.  (*Id.*, SOF

¶¶ 4–5; *admitted at* Pl.'s Resp., Resp. to SOF ¶¶ 4–5; *see also* Pl.'s Resp., Statement of

Additional Disputed Facts [hereinafter "Add'l SOF"] ¶ 11; *admitted at* Def.'s Reply, Resp.

Concerning Disputed Facts [hereinafter "Resp. to Add'l SOF"] ¶ 11.)  In compliance with the

court order, Defendant hired Plaintiff as a teacher at Fort Morgan High School ("FMHS").

(Def.'s Br., SOF ¶ 5; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 5.)

Plaintiff received several poor performance evaluations while working at FMHS.  (*Id.*,

SOF ¶ 6; *deemed admitted at* Pl.'s Resp., Resp. to SOF ¶ 6.)[1]  Subsequently, Plaintiff filed an

Equal Employment Opportunity Commission ("EEOC") charge, alleging these evaluations were

discriminatory and retaliatory.  (*Id.*, SOF ¶ 8; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 8.)  In July

2001, Plaintiff and Defendant mediated the charge and ultimately entered into a settlement

agreement, whereby: (1) Plaintiff agreed to dismiss his charge, resign his teaching position, and

never again seek employment with Defendant; and (2) Defendant agreed to pay Plaintiff

$142,500.  (*Id.*, SOF ¶ 9; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 9; Pl.'s Resp., Add'l SOF ¶ 21;

*admitted at* Def.'s Reply, Resp. to Add'l SOF ¶ 21.)

Defendant's superintendent, Dr. Dan Patterson, participated in the mediation of Plaintiff's

EEOC claims and was a decision-maker regarding the settlement.  (*Id.*, Add'l SOF ¶ 20; *admitted

at* Def.'s Reply, Resp. to Add'l SOF ¶ 20.)  Dr. Patterson believed Plaintiff's charges were

---

[1]Plaintiff denies this fact based upon his belief that the performance evaluations were unfounded.  (Pl.'s Resp., Resp. to SOF ¶ 2.)  His belief does not negate the fact that Plaintiff *received* such evaluations.  Consequently, I deem Defendant's contrary factual proffer admitted.

"frivolous" and "inaccurate" and considered the settlement, which was paid from the school district's general fund, "exorbitant."  (*Id.*, Add'l SOF ¶¶ 23–24; *admitted in relevant part at* Def.'s Reply, Resp. to Add'l SOF ¶¶ 23–24.)

### b.    *Plaintiff's Employment with the Tutoring Program*

The TriO One-Stop Project (the "Program" or "Tutoring Program") was run by Morgan Community College ("MCC") and funded by a federal grant.  (Def.'s Br., SOF ¶ 11; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 11; *see* Pl.'s Resp., Ex. 14 [MCC Resp. to EEOC Charge].)  The Program provided tutoring services to MCC students as well as local high school students.  (*Id.*)  Cheryl Page was the Program's Assistant Director.  (Def.'s Br., SOF ¶ 16; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 16.)

The tutors in the Program were MCC employees.  (Pl.'s Resp., Add'l SOF ¶ 41; *admitted at* Def.'s Reply, Resp. to Add'l SOF ¶ 41.)  MCC hired the tutors without input from Defendant.  (*Id.*, Add'l SOF ¶¶ 43–44; *admitted at* Def.'s Reply, Resp. to Add'l SOF ¶¶ 43–44.)  MCC was responsible for supervising and evaluating the tutors without input from Defendant.  (*Id.*, Add'l SOF ¶¶ 45–46, 51; *admitted at* Def.'s Reply, Resp. to Add'l SOF ¶¶ 45–46, 51.)  None of the funds MCC used to pay the tutors came from Defendant.  (*Id.*, Add'l SOF ¶¶ 47–48; *admitted at* Def.'s Reply, Resp. to Add'l SOF ¶¶ 47–48.)  While Defendant could prevent tutors from entering its facilities, only MCC had the power to terminate its tutors.  (*Id.*, Ex. 3 at 42 [Raines Dep.].)

In June 2004, Ms. Page hired Plaintiff as a tutor.  (Def.'s Br., SOF ¶ 23; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 23.)  Plaintiff told Ms. Page that he wanted to work approximately twenty

hours each week, but Plaintiff understood that the tutoring needs of the Program would vary as the school year progressed.  (*Id.*, SOF ¶¶ 24, 26; *admitted at* Pl.'s Resp., Resp. to SOF ¶¶ 24, 26.)  Ms. Page told Plaintiff that the demand for tutoring would end at the beginning of December 2004, but she made no representation about if or when tutoring would resume.  (*Id.*, SOF ¶ 28; *deemed admitted at* Pl.'s Resp., Resp. to SOF ¶ 28.)[2]

Plaintiff tutored at the MCC campus from September 2004 through mid-November 2004. (*Id.*, SOF ¶¶ 29–32; *admitted at* Pl.'s Resp., Resp. to SOF ¶¶ 29–32.)  During this time period, Plaintiff worked anywhere from six to fifteen hours a week, depending upon need.  (Pl.'s Resp., Add'l SOF ¶ 35; *admitted at* Def.'s Reply, Resp. to Add'l SOF ¶ 35.)

### c.      *The Tutoring Program's Involvement with Defendant*

In autumn 2004, Dr. Patterson approved a request that the Program extend its involvement into Defendant's schools by writing a letter in support of the Program.  (Def.'s Br., SOF ¶¶ 7, 12; *admitted at* Pl.'s Resp., Resp. to SOF ¶¶ 7, 12.)  Dr. Patterson had no further involvement with the Program.  (*Id.*)

In September 2004, Ms. Page met with FMHS Principal Ed Raines and Assistant Principal Bob Bever, and they agreed that the Tutoring Program would begin providing its services at FMHS.  (Pl.'s Resp., Add'l SOF ¶¶ 36–37; *admitted at* Def.'s Reply, Resp. to Add'l SOF ¶¶ 36–37.)  While Ms. Page understood Mr. Raines to be her "first contact" at FMHS, Mr. Raines delegated "the day-to-day operation of the [P]rogram [at FMHS]" to Mr. Bever.  (Def.'s Br.,

---

[2]Plaintiff denies this fact, asserting that "Ms. Page told [Plaintiff] that the demand for . . . tutoring would be ending *around Thanksgiving, [sic] 2004.*"  (Pl.'s Resp., Resp. to SOF ¶ 28 [emphasis added].)  I suggest that Plaintiff consult a calendar, because the distinction upon which he premises his frivolous denial is one without a difference.

SOF ¶ 22; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 22; Pl.'s Resp., Ex. 3 at 38 [Raines Dep.].)

Mr. Bever testified that he had no responsibilities regarding the Program beyond assigning tutors

to classrooms. (*Id.*, Ex. A–6 at 17 [Bever Dep.].)

### d. *Plaintiff Returns to FMHS*

In November 2004, Ms. Page asked Plaintiff if he was willing to tutor at FMHS. (*Id.*,

SOF ¶ 32; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 32.) Plaintiff asserts Ms. Page told him that he

could expect to work twenty hours per week as a tutor at FMHS. (Pl.'s Resp., Add'l SOF ¶ 54;

*admitted at* Def.'s Reply, Resp. to Add'l SOF ¶ 54.) Ms. Page asserts that she told Plaintiff the

FMHS position would be for two hours per week, not twenty. (*Id.*, Ex. 4 at 46 [Page Dep.].)

Regardless, Plaintiff agreed to tutor at FMHS, but he asked Ms. Page to "make sure everybody

[at the school district] knew that [he was] going to be there" because he had previously sued

Defendant and left a teaching position there. (Def.'s Br., SOF ¶¶ 33–34; *admitted at* Pl.'s Resp.,

Resp. to SOF ¶¶ 33–34.) Ms. Page advised Plaintiff that his first day of tutoring at FMHS would

be November 9, 2004. (*Id.*, SOF ¶ 37; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 37.)

On the morning of November 9, 2004, Plaintiff called Ms. Page and asked her to "make

sure everybody knows what's going on." (*Id.*, SOF ¶ 38; *admitted at* Pl.'s Resp., Resp. to SOF ¶

38.) Ms. Page told him: "Don't worry about it. Just go." (*Id.*, SOF ¶ 39; *admitted at* Pl.'s

Resp., Resp. to SOF ¶ 39.)

e.      *The Bever Meeting*

On the same day, Ms. Page attempted to contact Mr. Raines about her intention to place Plaintiff at FMHS.  (*Id.*, SOF ¶ 40; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 40.)  Mr. Raines and his secretary were unavailable, so Ms. Page instead asked Mr. Bever's secretary to insert an appointment on Mr. Bever's schedule for November 12, 2004.  (*Id.*, SOF ¶ 41; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 41.)  Ms. Page specifically indicated that she wanted to discuss whether it would be acceptable for Plaintiff to serve as a tutor at FMHS and requested that the secretary note on Mr. Bever's calender the reason for the meeting.  (Pl.'s Resp., Add'l SOF ¶ 60; *admitted at* Def.'s Reply, Resp. to Add'l SOF ¶ 60; Def.'s Br., Ex. A–4 at 59 [Page Dep.].)

On November 12, 2004, Ms. Page met with Mr. Bever and asked him "if it would be possible for [Plaintiff] to join her . . . at the tutorial [at FMHS] sponsored by [the Program]." (*Id.*, SOF ¶ 43; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 43.)  Mr. Bever responded that "it may not be a good idea" because "there are continuing or ongoing bad . . . feelings," noting "Dr. Patterson was the superintendent then and now."  (*Id.*, SOF ¶ 44; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 44.)

In making his response, Mr. Bever was referring to information he had read in a local newspaper concerning Plaintiff's first lawsuit against Defendant.  (*Id.*, SOF ¶ 45; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 45.)  Mr. Bever did not know about Plaintiff's second lawsuit or the resulting settlement.  (*Id.*, SOF ¶¶ 48–49; *admitted at* Pl.'s Resp., Resp. to SOF ¶¶ 48–49.)  None of Defendant's employees, including Dr. Patterson or Mr. Raines, had ever mentioned Plaintiff to Mr. Bever.  (*Id.*, SOF ¶ 46; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 46.)  Indeed, neither Mr.

Bever nor Mr. Raines worked for Defendant when Plaintiff was employed at FMHS. (*Id.*, SOF ¶ 57; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 57.)

### f.      Ms. Page's Response to the Meeting

Ms. Page assumed Mr. Bever "spoke as the school authority on the matter" of whether Plaintiff should tutor at FMHS. (*Id.*, Ex. A–4 at 124 [Page Dep.].) Ms. Page never spoke to Mr. Raines or Dr. Patterson about assigning Plaintiff or any other tutor within the school district. (*Id.*, SOF ¶ 59; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 59.) Based solely on Mr. Bever's representations, Ms. Page and her supervisors decided not to assign Plaintiff to FMHS. (*Id.*, Ex. A–4 at 111–12, 121 [Page Dep.]; Pl.'s Resp., Ex. 4 at 161 [Page Dep.].) She did so because she did not want to create a situation that could cause friction with Defendant. (Def.'s Br., SOF ¶¶ 61–62; *admitted in relevant part at* Pl.'s Resp., Resp. to SOF ¶¶ 61–62.)

On November 12, 2004, Ms. Page called Plaintiff and told him he could not tutor at FMHS because Mr. Bever informed her that "there were still hard feelings from before." (*Id.*, SOF ¶ 63; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 63.) Plaintiff continued to tutor at MCC through November 2004. (*Id.*, SOF ¶¶ 69, 71; *admitted at* Pl.'s Resp., Resp. to SOF ¶¶ 69, 71.)

### g.      Response to Letter from Plaintiff's Counsel

On December 9, 2004, Dr. Patterson received a letter from Plaintiff's attorney threatening a lawsuit based upon Defendant's interference with Plaintiff's employment relationship with MCC. (*Id.*, SOF ¶ 72; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 72; *see* Pl.'s Resp., Ex. 15 [12/9/04 Letter].) Prior to receiving the letter, Dr. Patterson had no knowledge of either

Plaintiff's renewed involvement with FMHS or Ms. Page's discussion with Mr. Bever.  (Def.'s Br., SOF ¶¶ 72–73; *admitted at* Pl.'s Resp., Resp. to SOF ¶¶ 72–73.)

Subsequently, Dr. Patterson spoke with MCC Assistant Dean Ken Carlson, asking why he was not called regarding Plaintiff's renewed involvement with FMHS and stating that he did not care if Plaintiff tutored at FMHS.  (*Id.*, SOF ¶ 75; *deemed admitted at* Pl.'s Resp., Resp. to SOF ¶ 75; Def.'s Br., Ex. A–3 ¶ 12 [Patterson Aff.].)[3]  Neither Dr. Patterson nor any agent of Defendant contacted Plaintiff or his counsel to inform Plaintiff that he could tutor at FMHS.  (Pl.'s Resp., Add'l SOF ¶ 80; *admitted at* Def.'s Reply, Resp. to Add'l SOF ¶ 80.)

### h.    *Further Communications Between Dr. Patterson and MCC*

On an unspecified date, Dr. Patterson spoke to MCC Vice President Phyllis Gertge about Plaintiff's grievance.  (*Id.*, Add'l SOF ¶¶ 81–82; *admitted at* Def.'s Reply, Resp. to Add'l SOF ¶¶ 81–82.)  Plaintiff asserts that after speaking with Dr. Patterson on an unspecified date, MCC President Michelle Haney believed that Plaintiff was "using" MCC — presumably to stage the instant lawsuit.  (*Id.*, Add'l SOF ¶ 87; *admitted at* Def.'s Reply, Resp. to Add'l SOF ¶ 87.)

On yet another unspecified date, Ms. Haney summoned Ms. Page to her office.  (*Id.*, Add'l SOF ¶¶ 83–84; *admitted at* Def.'s Reply, Resp. to Add'l SOF ¶¶ 83–84.)  In the meeting, an unidentified person told Ms. Page that she had "pushed the envelope" by asking Defendant to

---

[3]Plaintiff denies this proffer, asserting it is undermined by the fact that Defendant has argued in this litigation that Plaintiff violated the parties' settlement agreement by tutoring at FMHS.  (Pl.'s Resp., Resp. to SOF ¶ 75.)  The fact that Defendant's litigation-related position differs from Dr. Patterson's recollection of statements he made in a phone call to MCC disproves nothing.  Defendant's proffer is therefore deemed admitted.

accept Plaintiff as a tutor. (*Id.*, Add'l SOF ¶ 86; *admitted at* Def.'s Reply, Resp. to Add'l SOF ¶ 86.)

### i.   Spring Semester 2005

MCC hired forty new tutors to provide tutoring services at MCC for the spring semester. (*Id.*, Add'l SOF ¶ 89; *admitted at* Def.'s Reply, Resp. to Add'l SOF ¶ 89.) On February 11, 2005, Ms. Page sent Plaintiff an email stating: "We are starting tutoring at MCC . . . . Please contact me and let me know your availability. Tentatively the spot I need is Tuesday and Wednesday 1:00 to 3:00." (Def.'s Br., SOF ¶ 80; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 80.) Plaintiff responded by voicemail: "four hours a week just isn't sufficient to overcome all the hurdles I have to overcome to come in. If I had more hours, or, I don't know, would be able to go to [FMHS], whatever, that might work." (*Id.*, SOF ¶ 81; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 81.)

On February 18, 2005, Ms. Page sent Plaintiff an email in which she offered him two three-hour shifts per week and an "additional longer day on Fridays," but Plaintiff did not receive the email. (*Id.*, SOF ¶ 83; *deemed admitted at* Pl.'s Resp., Resp. to SOF ¶ 83.)[4] Plaintiff never told anyone he was quitting the Tutoring Program, nor was he told he was fired. (*Id.*, SOF ¶¶ 84–85; *admitted at* Pl.'s Resp., Resp. to SOF ¶¶ 84–85.) Plaintiff claims he was constructively discharged because he was told that he would only be given four hours of tutoring work at MCC

---

[4]In a series of ridiculous denials, this is the most egregious. Plaintiff responds to Defendant's assertion with the following: "Deny. [Plaintiff] did not receive the email." (Pl.'s Resp., Resp. to SOF ¶ 83.) In the future, it would behoove Plaintiff to finish reading proffers before composing his denials. Defendant's proffer is hereby deemed admitted.

per week and those hours were insufficient to make his continued part-time employment

"economically viable."  (*Id.*, SOF ¶ 86; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 86.)

## ANALYSIS

### 1.     *Legal Standard*

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant

summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions

on file, together with the affidavits, if any, show that there is no genuine issue as to any material

fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)

(2007); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Concrete Works, Inc.*

*v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).  The moving party bears the

initial burden of showing an absence of evidence to support the nonmoving party's case.  *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "Once the moving party meets this burden, the

burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material

matter."  *Concrete Works*, 36 F.3d at 1518 (citing *Celotex*, 477 U.S. at 325).  The nonmoving

party may not rest solely on the allegations in the pleadings, but must instead designate "specific

facts showing that there is a genuine issue for trial."  *Celotex*, 477 U.S. at 324; *see* Fed. R. Civ. P.

56(e) (2007).  A fact in dispute is "material" if it might affect the outcome of the suit under the

governing law; the dispute is "genuine" if the evidence is such that it might lead a reasonable jury

to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir.

1997) (citing *Anderson*, 477 U.S. at 248).  The court may consider only admissible evidence when

ruling on a summary judgment motion.  *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d

1467, 1474 (10th Cir. 1985). The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment. *Byers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998) (citing *Concrete Works*, 36 F.3d at 1517).

**2.   Evaluation of Claims**

   **a.   ADA and Rehabilitation Act Claims**

      **i.   Legal Framework**

Because section 504 the Rehabilitation Act incorporates the standards of the ADA, decisions under both acts apply to Plaintiff's retaliation claim. *See* 29 U.S.C.A. § 794(a), (d) (West 2007); *Woodman v. Runyon*, 132 F.3d 1330, 1339 n.8 (10th Cir. 1997). To establish a *prima facie* case of retaliation, a plaintiff must demonstrate that: (1) he engaged in protected opposition to discrimination; (2) a reasonable employee would have found the challenged action materially adverse; and (3) a causal connection existed between the protected activity and the materially adverse action. *Burlington N. & Santa Fe Ry. Co. v. White*, — U.S. — , 126 S. Ct. 2405, 2415 (2006); *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006).

The Tenth Circuit has long held that the anti-retaliation provision of Title VII of the Civil Rights Act of 1964 ("Title VII") must be construed to encompass claims brought by former employees. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997) (holding that former employees are included within the range of Title VII's anti-retaliatory provisions); *Rutherford v. Am. Bank of Commerce*, 545 F.2d 1162, 1166 (10th Cir. 1977) (same). "Cases interpreting the ADA

retaliation provisions are persuasive authority in Title VII retaliation cases . . . ." *Pastran v. K-Mart Corp.*, 210 F.3d 1201, 1205 n.5 (10th Cir. 2000).

### ii.    *Retaliation Arguments*

Instead of addressing the glaring lack of evidence of retaliatory intent on the part of Mr. Bever, Defendant instead makes three weak sets of arguments against Plaintiff's retaliation claims. I consider each set of arguments in turn.

A. MATERIALLY ADVERSE ACTION — First, with flagrant disregard for the case law, Defendant argues that it took no adverse action against Plaintiff, contending the fact that MCC made the decision not to place Plaintiff at FMHS alleviates it of any liability.  (Def.'s Br. at 15–16.)  In response, Plaintiff points to case law supporting the conclusion that adverse employment action is "any action taken by an employer against a former employee that may damage the former employee's new or prospective employment opportunities."  (Pl.'s Resp. at 18–21.)

The Tenth Circuit had held that a *prima facie* case of retaliation under Title VII requires an "adverse employment action," but the Supreme Court recently revised that standard.  *Argo*, 452 F.3d 1202 n.2 (citing *White*, 126 S. Ct. at 2415).  Instead, to prevail on a Title VII retaliation claim, a plaintiff need show "that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *White*, 126 S. Ct. at 2415 (citations and quotation marks omitted); *EEOC v. PVNF, L.L.C.*, — F.3d —, 2007 U.S. App. LEXIS 11276, at *34 n.8 (10th Cir. 2007) (stating "the challenged action in a retaliation claim need not necessarily

result in an adverse effect on the terms or conditions of employment, so long as it would dissuade a reasonable employee from engaging in protected activity"); *see also Berry v. Stevinson Chevrolet*, 74 F.3d 980, 986 (10th Cir. 1996) (holding actionable retaliation is that which carries a "significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects").

Defendant assumes that the requisite objectively material adverse action is exclusively limited to "tangible employment action," as characterized by the Supreme Court. *See Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998) ("A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."). This assumption is dead wrong. *See White*, 126 S. Ct. at 2412–13 (flatly rejecting argument that only "tangible employment actions" are congizable under Title VII's anti-retaliation provision). Instead, the appropriate course is to take a "case-by-case approach examining the unique factors relevant to the situation at hand." *Hillig v. Rumsfeld*, 381 F.3d 1028, 1031 (10th Cir. 2004); *accord White*, 126 S. Ct. at 2415 ("[T]he significance of any given act of retaliation will often depend upon the particular circumstances. Context matters."); *see McGowan v. City of Eufala*, 472 F.3d 736, 742 (10th Cir. 2006) (noting the case-by-case approach to be consistent with *White*).

"One factor that strongly indicates a challenged action is an 'adverse employment action' is that the action causes 'harm to future employment prospects.'" *Hillig*, 381 F.3d at 1031 (quoting *Berry*, 74 F.3d at 986). Here, Mr. Bever told Ms. Page that Plaintiff's presence at

FMHS "may not be a good idea" because "there are continuing or ongoing bad . . . feelings" — feelings apparently held by Dr. Patterson. (Def.'s Br., SOF ¶ 44; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 44; *see id.*, Ex. A–4 at 111–12, 121 [Page Dep.]; Pl.'s Resp., Ex. 4 at 161 [Page Dep.].) Subsequently, Ms. Page told Plaintiff he could not tutor at FMHS — and the parties dispute whether this caused Plaintiff to lose eighteen hours of tutoring per week or just two. (Def.'s Br., Ex. A–4 at 68 [Page Dep.]; Pl.'s Resp., Ex. 1 at 179– 182 [Carr Dep.], Ex. 4 at 46–48 [Page Dep.].) Assuming that Mr. Bever's statement was made with an intent to retaliate,[5] a reasonable juror could conclude that the statement was not mere "trivial conduct," but was instead conduct that would "dissuade a reasonable employee from engaging in protected activity." *White*, 126 S. Ct. at 2414–15; *PVNF*, 2007 U.S. App. LEXIS 11276, at *34 n.8.

    Defendant makes three weak arguments counseling against this result. First, Defendant argues that "inherent in the analysis of [Plaintiff's] ADA . . . retaliation claim[] is the principle that the adverse action in question must be taken by the defendant." (Def.'s Br. at 14.) This argument ignores the fact that a negative reference made with retaliatory intent can constitute an objectively material adverse action. *See Hillig*, 381 F.3d at 1035 (holding that "strong" negative references

_____

[5]Inexplicably, Defendant does not raise the issue of whether Mr. Bever's statements suggest any intent to retaliate against Plaintiff based on his past protected conduct. (*See* Def.'s Br.; Def.'s Reply.)  Of course, there is no such thing as unintentional retaliation. *See Wells v. Colo. Dep't of Transp.*, 325 F.3d 1205, 1218 (10th Cir. 2003) ("The causal-connection element of a *prima facie* retaliation claim requires the employee to show that the employer's motive for taking adverse action was its desire to retaliate for the protected activity.").  Notwithstanding the paucity of evidence suggesting any retaliatory intent on the part of Defendant, the lack of argument on this issue leads the court to conclude that it ought to refrain from considering whether Plaintiff has come forward with sufficient evidence of retaliatory intent.  *See Anderson*, 477 U.S. at 255 (stating trial court has discretion to deny summary judgment if prudent course is to proceed to trial).

-16-

by former supervisors constituted actionable retaliation); *White*, 126 S. Ct. at 2415.  Moreover,

none of the unexplained string of citations that Defendant offers in apparent support of the

asserted proposition actually supports it.  First, Defendant cites to *Robinson*, 519 U.S. at 346,

where the Court stated its holding that former employees are protected by Title VII's anti-

retaliation provisions.  This gets Defendant nowhere.  Next, Defendant cites to the first page of

*Selenke v. Medical Imaging of Colorado*, 248 F.3d 1249 (10th Cir. 2001).  However, in the

portion of *Selenke* that actually addresses retaliation, *id.* at 1264–66, there is no discussion of

anything even marginally related to the proposition Defendant attributes to the case.[6]  I would

suggest that defense counsel reconsider the efficacy of unadorned string citations to inapposite

cases.  If counsel cannot *explain* how a string of cases bolsters Defendant's position, then such

citations are no more availing than:



(Figure 1.1: Pig Wearing Lipstick)

---

[6]Defendant also cites two First Amendment cases rendered irrelevant by the parties' stipulated dismissal of Plaintiff's First Amendment claim.  (*See* Def.'s Br. at 14–15.)

Next, Defendant argues that "a plaintiff cannot bring an action unless a supervisory employee participates or has significant input into the personnel decisions that constituted the alleged discriminatory conduct." (Def.'s Br. at 15.)  Defendant first cites to *Woodward v. Worland*, 977 F.2d 1392, 1404 (10th Cir. 1992), where the court noted that a failed free speech retaliation claim suffered an "additional defect" because the defendants were the plaintiffs' coworkers rather than supervisors.  This citation is yet another nonstarter.  Next, Defendant cites to *Tafoya v. Adams*, 612 F. Supp. 1097, 1104 (D. Colo. 1985), where the court analyzed whether a supervisor had responsibility and power to employ personnel and control conditions of employment.  The case is inapposite — it fails to address the situation where an agent of an employer was alleged to have retaliated against a former employee.  *See id.*  Setting aside Defendant's seemingly random citations and assuming, *arguendo*, that the proffered legal assertion is well-founded, a reasonable juror could conclude that, as FMHS's assistant principal, Mr. Bever is a supervisory employee whose comments concerning Plaintiff could be expected to carry significant weight with Plaintiff's current employer.

Finally, at the end of its brief, Defendant throws in an argument that relates most closely to Plaintiff's retaliation claim.  Defendant asserts:

> [Plaintiff's] Amended Complaint contains an allegation that he was 'constructively discharged' from his position at MCC.  However, even if one or both of [Plaintiff's] claims survive summary judgment, he should not be entitled to pursue this component of his claims [because] the required elements of constructive discharge are simply not present.

(Def.'s Br. at 27.)  In response, Plaintiff states: "constructive discharge is not a separate claim in this case.  Plaintiff can still recover damages for [] Defendant's adverse action even in the absence

of constructive discharge." (Pl.'s Resp. at 30.)  Plaintiff is correct.  Even if the reduction in

hours that Plaintiff alleges he suffered did not effectuate a constructive discharge, I have already

determined that Mr. Bever's statement to Ms. Page could reasonably be construed as an action

that a "reasonable employee . . . would have found materially adverse." *White*, 126 S. Ct. at

2415.

B. MR. BEVER'S AUTHORITY — Next, Defendant argues that, as assistant principal, Mr.

Bever's authority with respect to the Program was limited only "to finding available places in the

FMHS building for [] tutoring to take place." (Def.'s Br. at 17.)  Defendant further contends that

Mr. Bever was not authorized — either expressly or by statute — to speak on its behalf regarding

Plaintiff. (*Id.*)  Additionally, Defendant characterizes Mr. Bever's statements to Ms. Page as

"nothing more that statements of personal opinion" that may not be construed as adverse action.

(*Id.*)  In response, Plaintiff argues that Mr. Bever had both express and implied authority to speak

on Defendant's behalf. (Pl.'s Resp. at 21–23.)  Plaintiff also attacks Defendant's characterization

of Mr. Bever's expressions to Ms. Page as "personal opinion" as legally and factually unfounded.

(*Id.* at 23.)  For the reasons set forth below, I reject Defendant's arguments.

I will first review the facts relevant to the argument concerning Mr. Bever's purportedly

narrow authority.  On one hand, there is evidence suggesting that Ms. Page knew that: (1) Mr.

Raines was the primary contact and ultimate decision-maker with respect to the Program; and (2)

Mr. Bever's only role with respect to the Program was assigning tutors to classrooms. (Def.'s

Br., Ex. A–4 at 115 [Page Dep.], Ex. A–6 at 17 [Bever Dep.].)  On the other hand, there is

evidence suggesting Mr. Bever was in charge of the "day-to-day operation" of the Program at

FMHS. (Pl.'s Resp., Ex. 3 at 38 [Raines Dep.].) Additionally, when Mr. Raines was unavailable to discuss with Ms. Page whether Plaintiff should tutor at FMHS, Ms. Page made an appointment with Mr. Bever, indicating that the meeting was "in regard to [Plaintiff] and [that she] want[ed] [the secretary] to include that on [Mr. Bever's] [] calendar so that he would have an opportunity to look at that." (Def.'s Br., Ex. A–4 at 58–59 [Page Dep.].) The meeting was scheduled on November 9, 2004 and took place on November 12, 2004. (*Id.*, Ex. A–4 at 61–62 [Page Dep.].)

Construing the evidence in the light most favorable to Plaintiff, a reasonable juror might infer that Mr. Bever: (1) took note of the meeting and its purpose prior to its occurrence; and (2) would have contacted Mr. Raines if it pertained to an issue beyond his purview. Thus, these facts and the reasonable inferences therefrom suggest that Plaintiff has raised a genuine issue for trial with regard to whether Mr. Bever had the authority to speak on behalf of Defendant. *See* RESTATEMENT (THIRD) OF AGENCY §2.01 cmt. b (2006) (stating that "implied authority" means authority "to act in a manner in which an agent believes the principal wishes the agent to act based on the agent's reasonable interpretation of the principal's manifestation in light of the principal's objectives and other facts known to the agent").

In making its argument that Mr. Bever lacked the authority to speak on Defendant's behalf regarding Plaintiff, Defendant cites to a Colorado education statute concerning the authority of school principals to act, subject to the ultimate supervision of superintendents. (Def.'s Br. at 17–18.) In relevant part, Colorado Revised Statute section 22–32–126 provides: "The principal shall assume the administrative responsibility and instructional leadership . . . for the planning, management, operation, and evaluation of the educational program of the schools to which he is

assigned." Colo. Rev. Stat. § 22–32–126(2) (2007).  Nothing in this or any related provision suggests that a principal cannot delegate aspects of his duties to his subordinates, particularly to an *assistant principal* such as Mr. Bever. *See id.*

I now turn to Defendant's argument that Mr. Bever was merely expressing his "personal opinion" to Ms. Page.  (Def.'s Br. at 17.)  Citing to *EEOC v. Wiltel, Inc.*, 81 F.3d 1508, 1514 (10th Cir. 1996), Defendant contends that "statements of personal opinion . . . may not be construed as an adverse action by [Defendant]."  (Def.'s Br. at 17.)  *Wiltel* is inapposite.  The discussion to which Defendant cites concerns the distinction between direct and indirect evidence of discrimination.  81 F.3d at 1514.  While Defendant correctly parrots the court's statement that "expressions of personal opinion or bias do not constitute direct evidence of discrimination," it overlooks the subsequent sentence which states that "such statements require the trier of fact to infer that discrimination was a motivating cause of an employment decision, they are at most circumstantial evidence of discriminatory intent."  *Id.*  As noted above, neither party has briefed the closely related issue of whether Mr. Bever's statement of "personal opinion" to Ms. Page might constitute indirect evidence of retaliatory intent, so I do not reach it at this juncture.

C.  THE IMPACT OF TUTORING AT FMHS ON THE SETTLEMENT AGREEMENT — Out of an abundance of bad arguments, this may be Defendant's worst.  First, Defendant points to the terms of its 2001 settlement agreement with Plaintiff, which preclude Plaintiff from seeking employment with Defendant.  (Def.'s Br. at 19.)  Defendant then proceeds to argue: "If [Plaintiff] were to have worked as a tutor at [FMHS], he would have been subject to [Defendant's] direction, control and power to remove him from FMHS, just as any adult working with students in [the school district].

As a result, [Defendant] would have been [Plaintiff's] joint employer." (*Id.* at 20.)  From this,

Defendant concludes that Plaintiff violated the terms of the settlement agreement by tutoring at

FMHS. (*Id.* at 22.)  Defendant neglects, however, to argue that Mr. Bever was aware of those

terms, let alone that such an awareness motivated his representations to Ms. Page.  (*Cf. id.*, SOF

¶¶ 48–49 [asserting Mr. Bever was unaware of Plaintiff's second EEOC charge or the resulting

settlement].)  Plaintiff contends that this argument "misapprehends the law and the facts in this

case." (Pl.'s Resp. at 24.)  I agree.

     In a Title VII case, the Tenth Circuit stated: "We treat independent entities as joint

employers 'if the entities share or co-determine those matters governing the essential terms and

conditions of employment.  In other words, courts look to whether both entities exercise

significant control over the same employees.'" *Sandoval v. Boulder Reg'l Communs. Ctr.*, 388

F.3d 1312, 1323 (10th Cir. 2004) (citing *Bristol v. Bd. of County Comm'rs*, 312 F.3d 1213, 1220

[10th Cir. 2002] [en banc]).  "'Most important to control over the terms and conditions of an

employment relationship is the right to terminate it under certain circumstances.'" *Id.* (quoting

*Bristol*, 312 F.3d at 1219).

     Defendant's own factual admissions undermine any reasonable inference of a joint

employment relationship.  It is undisputed that: (1) the tutors in the Program were MCC

employees; (2) MCC hired the tutors without input from Defendant; (3) MCC was responsible for

supervising and evaluating the tutors without input from Defendant; and (4) MCC paid the tutors

and received no money from Defendant.  (Pl.'s Resp., Add'l SOF ¶¶ 41, 44–48, 51; *admitted at*

Def.'s Reply, Resp. to Add'l SOF ¶¶ 41, 44–48, 51.)  Further, while Defendant could preclude

tutors from entering its facilities, only MCC had the power to terminate their employment.  (*Id.*, Ex. 3 at 42 [Raines Dep.].)  In light of both the uncontroverted evidence and Defendant's own admissions, I find it is indisputable that MCC — and MCC alone — exercised significant control over the essential terms of Plaintiff's employment.  Defendant's further arguments to the contrary are frivolous and merit no consideration.  (*See* Def.'s Br. at 19–22.)

  b.    ***Obstruction of Justice***

Unfortunately, the frivolity of Defendant's joint-employment argument is rivaled by that of Plaintiff's obstruction of justice claim.  In his complaint, Plaintiff asserted that Dr. Patterson, Mr. Bever, and other unknown "managers, agents[,] and employees of [] Defendant" conspired "to injure Plaintiff [] on account of his attendance at and testimony against Defendant in Plaintiff[]'s lawsuit against Defendant . . . and for filing a Charge of Discrimination with the EEOC."  (Am. Compl. ¶ 33.)  Defendant attacks the claim on two fronts.  First, Defendant argues Plaintiff cannot show that "two or more persons acted in concert" to retaliate against him for his prior involvement in a federal lawsuit.  (Def.'s Br. at 24.)  Second, Defendant argues that the claim is preempted by Plaintiff's ADA claim.  (*Id.* at 27.)  In light of Plaintiff's abject failure to marshal facts suggesting the existence of a conspiracy, I will assume without deciding that Plaintiff's ADA claim does not preempt his obstruction of justice claim.

Originally enacted as the second section of the Civil Rights Act of 1871, section 1985 of Title 42 of the United States Code outlaws various classes of conspiratorial activity.  *Kush v. Rutledge*, 460 U.S. 719, 724 (1983).  Section 1985(2) proscribes conspiracies to interfere with

the administration of justice in federal and state courts.  42 U.S.C.A. § 1985(2) (West 2007);

*Kush*, 460 U.S. at 724.

The existence of a conspiracy is an essential element of a cause of action under section

1985(2).  *Abercrombie v. City of Catoosa*, 896 F.2d 1228, 1230 (10th Cir. 1990).  A civil

conspiracy requires a meeting of the minds or agreement among the defendants and concerted

action.  *See id.* at 1230–31 (affirming summary judgment against plaintiff's section 1985[2] claim

where plaintiff failed to establish "either by direct or circumstantial evidence, a meeting of the

minds or agreement among the defendants").

Plaintiff has produced no evidence of a meeting of the minds or concerted action between

Dr. Patterson, Mr. Bever, and any unidentified coconspirators.  Instead, Plaintiff has admitted

facts that defeat any reasonable inference of a conspiracy.  Plaintiff admitted that Mr. Bever's

conversation with Ms. Page was based *solely* upon information Mr. Bever gleaned from

newspaper accounts of Plaintiff's 1996 lawsuit against Defendant.  (Def.'s Br., SOF ¶¶ 44–45;

*admitted at* Pl.'s Resp., Resp. to SOF ¶¶ 44–45.)  Plaintiff also admitted that: (1) the 1996 lawsuit

occurred prior to Mr. Bever's employment in the school district; and (2) Mr. Bever did not know

about Plaintiff's second lawsuit or the resulting settlement.  (*Id.*, SOF ¶¶ 45, 48–49; *admitted at*

Pl.'s Resp., Resp. to SOF ¶¶ 45, 48–49.)  Most poignantly, Plaintiff admitted that, prior to

speaking with Ms. Page, *none* of Defendant's employees had ever mentioned Plaintiff to Mr.

Bever.  (*Id.*, SOF ¶ 46; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 46.)  Thus, it can hardly be said

that there was any "meeting of the minds" among Defendant's employees — let alone that any

concerted action took place.  *See Abercrombie*, 896 F.2d at 1230–31.

Instead of merely dropping the claim, Plaintiff attempted to amend it without the court's approval, perhaps hoping the changes would escape notice.  In his response brief, Plaintiff abandons reference to any conspiracy involving Mr. Bever and instead alleges a new conspiracy between Dr. Patterson and various *MCC employees*.  (Pl.'s Resp. at 28.)  Pursuant to Federal Rule of Civil Procedure 15, courts may construe new claims raised in a plaintiff's summary judgment briefings as a motion to amend the complaint.  *See* Fed. R. Civ. P. 15 (2007); *Viernow v. Euripides Dev. Corp.*, 157 F.3d 785, 790 n.9 (10th Cir. 1998).  Generally, a plaintiff ought not be prohibited from pursuing a valid claim due to his failure to set forth in the complaint a theory upon which he could recover, so long as the "'late shift in the thrust of the case will not prejudice the other party in maintaining his defense upon the merits.'"  *Evans v. McDonald's Corp.*, 936 F.2d 1087, 1090–91 (10th Cir. 1991) (quoting 5 WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1219 at 194 [2d ed. 1990]).  Indeed, the Tenth Circuit has held that "the purpose of fact pleading, as provided by [Federal Rule of Civil Procedure] 8(a)(2), is to give the defendant fair notice of the claims against him without requiring the plaintiff to have every legal theory or fact developed in detail before the complaint is filed."  *Id.* at 1091.  Importantly, this pleading standard, albeit liberal, does not provide for eleventh-hour changes in strategies, arguments, and theories in cases.  "This practice, if permitted, would waste the parties' resources, as well as judicial resources, on discovery aimed at ultimately unavailing legal theories and would unfairly surprise defendants, requiring the court to grant further time for discovery or continuances."  *Id.*

In keeping with the foregoing, the Tenth Circuit has held that "untimeliness alone is a sufficient reason to deny leave to amend, especially when the party filing the motion has no

adequate explanation." *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1365 (10th Cir. 1993) (citations omitted). Here, Plaintiff offers no explanation as to why this court should allow an amendment of the complaint at this stage in the case. (*See* Pl.'s Resp.) It is difficult to ascertain — and Plaintiff makes no argument to aid the court in its endeavor — why Plaintiff could not have presented this theory in a more timely manner. Certainly, had Defendant known that Plaintiff was pursuing this theory, it might have chosen to inquire as to which MCC employees were part of the newly alleged conspiracy and might have deposed them about their involvement therewith. In light of both the unjustifiable untimeliness and potential prejudicial impact of Plaintiff's implicit motion to amend, it is hereby denied.

Even were this court to allow Plaintiff to amend his complaint, the conspiracy claim would still fail. Plaintiff asserts no facts from which a fact finder could reasonably infer that Dr. Patterson and one or more MCC employees agreed to retaliate against Plaintiff for his lawsuits against Defendant. (*See id.*) Without more, the mere fact that, after speaking to Dr. Patterson, MCC employees believed Plaintiff might have been "using" the Program to stage a lawsuit does not give rise to a reasonable inference that Dr. Patterson and those employees had hatched a retaliatory plan to "constructively discharge" Plaintiff based on his past involvement in a federal lawsuit. (*See id.* at 28.) There is a difference between circumstantial evidence and wild speculation. *See Zampos v. U.S. Smelting, Refining & Mining Co.*, 206 F.2d 171, 173–74 (10th Cir. 1953) ("[F]limsy allegations which are transparently not well founded fact are insufficient to state a justiciable controversy requiring the submission thereof for trial."). Plaintiff's counsel ought to have perceived this difference and opted not to waste this court's time.

*3.*     *Conclusion*

Based on the foregoing it is therefore ORDERED that:

1.       DEFENDANT's motion (#37) is GRANTED in part and DENIED in part.

Defendant's motion is granted as to Plaintiff's third claim for relief, which is

hereby dismissed with prejudice.  Defendant's motion is otherwise denied.

2.       The court will hold a Final Pretrial Conference commencing at 10:30 o'clock a.m.

on Friday, August 17, 2007, in Courtroom A201 of the Alfred A. Arraj United

States Courthouse, 901 19th Street, Denver, Colorado.  In preparing for and

participating in the conference, the parties and counsel will (1) follow the

Instructions for Preparation and Submission of Final Pretrial Order, a copy of

which can be downloaded from the court's web site, specifically

http://www.cod.uscourts.gov/forms/ewn_fin_pre_ord_ins.pdf, and (2) utilize the

specific template located at

http://www.cod.uscourts.gov/forms/ewn_fin_pre_ord.wpd.  These specific web

addresses should be used to insure that the proper format is observed.

Dated this 9th day of July, 2007

BY THE COURT:


s/ Edward W. Nottingham
EDWARD W. NOTTINGHAM
Chief United States District Judge